UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
--------------------------------------------------x
                                    :
ZENA PARKER                         :          3:13 CV 1398 (JGM)
                                    :
V.                                  :
                                    :
CAROLYN W. COLVIN,                  :
ACTING COMMISSIONER OF              :
SOCIAL SECURITY                     :
                                    :          DATE: DECEMBER 5, 2014
-------------------------------------------------- x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Supplemental Security Income benefits ["SSI"].

## I.  ADMINISTRATIVE PROCEEDINGS

On December 15, 2009, plaintiff, Zena B. Parker, applied for SSI in which application she claims that she has been disabled since December 1, 1998,[1] due to status HIV positive, peripheral neuropathy, right elbow tendon tear with epicondilitis, left ankle reconstruction, migraines, a history of a broken collar bone, and major depressive disorder, recurrent and severe. (Certified Transcript of Administrative Proceedings, dated December 12, 2013 ["Tr."]

---

[1]At her hearing before the ALJ, plaintiff amended her onset date of disability to December 15, 2009.  (Tr. 47-48).

Plaintiff reported that she stopped working in December 2003 because of her "condition(s)[,]" she could not stand for long and she had problems with her hands, and because her father passed away in 2003 and her sister passed away in 2004.  (Tr. 260).

48, 71-72, 222-28, 259).[2]  Plaintiff's application was denied initially and upon reconsideration. (Tr.  71-102, 106-112; <u>see</u> Tr. 103-05).   On or about July 8, 2010, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"] (<u>see</u> Tr. 115-17; <u>see</u> Tr. 118-36, 193-210, 213-21), and on January 3, 2012, a rescheduled hearing[3] was held before ALJ James E. Thomas, at which plaintiff and Jeffrey Joy, a vocational expert, testified. (Tr. 43-70; <u>see</u> Tr. 211-12).   Plaintiff was and continues to be represented by counsel. (<u>See</u> Tr. 16, 21, 43-44, 113-14).   On January 27, 2012, ALJ Thomas issued his unfavorable decision finding that plaintiff was not disabled through the date she was last insured.  (Tr. 26-30).  On March 16, 2012, plaintiff filed her request for review of the hearing decision (Tr. 22, 24), and on July 8, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 6-8; <u>see also</u> Tr. 1-3, 5).

On September 24, 2013, plaintiff filed her complaint in this pending action (Dkt. #1),[4] and on December 23, 2013, defendant filed her answer. (Dkt. #12).[5]  On May 21, 2014, plaintiff filed her Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing, with brief in support.  (Dkt. #16; <u>see</u> Dkts. ##14-15). On July 23, 2014, defendant filed her Motion to Affirm the Decision of the Commissioner, with brief in support (Dkt. #20; <u>see</u> Dkts. ##17-19), and on August 13, 2014,

---

[2]On the same day, plaintiff applied for disability insurance benefits, but she has no history of substantial gainful activity.  (Tr. 229-32; <u>see</u> Tr. 233, 237-40).

[3]Plaintiff's original hearing was scheduled for May 18, 2011, and then rescheduled to August 29, 2011, before being held on January 3, 2012.  (<u>See</u> Tr. 137-57, 158-61, 162-92, 286).

[4]On the same day, plaintiff filed a Motion for Leave to Proceed <u>In Forma Pauperis</u>, which motion was granted the next day.  (Dkts. ##2, 7).

[5]Attached to defendant's Answer is the certified administrative transcript, dated December 12, 2013.

2

plaintiff filed duplicate copies of her reply brief.  (Dkts. ##21-22).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #16) is granted in large part such that this matter is remanded consistent with the conclusion reached in Section IV.A.1. infra; defendant's Motion to Affirm (Dkt. #20) is granted in limited part and denied in large part.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1964, and is fifty years old.  (Tr. 46, 222).  Plaintiff was never married, she has three adult children, and at the time of the hearing, she was living with her boyfriend and her roommate in a two story house.  (Tr. 49, 59, 222; see Tr. 246). She completed the eleventh grade (Tr. 46, 98), and at the time of her hearing, her only source of income was food stamps.  (Tr. 49).  She was incarcerated twice – the first time was from October 2007 to December 14, 2009, and more recently, from May 31, 2011 to October 18, 2011 for a curfew or parole violation. (Tr. 50, 61-62).   At the time of her hearing, plaintiff had been sober for seven months.  (Tr. 50-51).

Plaintiff testified that her boyfriend does the household chores, dishes, laundry, and grocery shopping (Tr. 59-60), although she also reported that she does "small" household cleaning.  (Tr. 249).   She does not have a license, so "sometimes" she walks to wherever she needs to go. (Tr. 60-61, 249).  She watches television and talks to her children and grandchildren on the phone.  (Tr. 60, 250-51).

Plaintiff testified that her peripheral neuropathy in her left leg causes her constant pain from her calf to her hip, and the pain feels like a tingling or numbness sensation.  (Tr.

52).  She also "tend[s] to lose [her] balance[,]" and she "tends to have sharp pain going from [her] ankle up to [her] thigh to [her] hip."  (Tr.  52, 56, 250, 283).  Every two or three days, the pain reaches a ten on a pain scale of one to ten.  (Tr. 54).  She elevates or massages her leg to alleviate the pain  (Tr. 52, 54, 57-58), or takes Tramadol or Gabapentin. (Tr. 54, 287-88). Plaintiff reported that she can walk less than a mile, or around ten to fifteen minutes before having to rest.  (Tr. 252; see also Tr. 56 (plaintiff testified that she can walk for five or ten minutes before she has to stop from pain.)).   Plaintiff testified that she uses a cane when she goes to the store (Tr. 57), and when she walks up stairs, she puts both feet on each stair before stepping up to the next one.  (Tr. 59, 251 (impairment affects ability to stand, walk and climb stairs)). She can stand in one place for ten minutes before her leg hurts, and she can sit for about twenty minutes with her feet on the ground.  (Tr. 57). Plaintiff reported that her impairments also affect her ability to lift and kneel. (Tr. 251).

Plaintiff experiences depression in that she "lose[s] interest in everything[,]" she has "no energy for nothing[,]" and she has suicidal thoughts. (Tr. 58; see Tr. 275).  She cries often and she has problems concentrating.  (Id.).  Additionally, she has difficulty sleeping because her mind races "constantly." (Tr. 58-59).   She does not follow spoken instructions well because she "forget[s,]" and she does not handle stress or changes in routine well.  (Tr. 252).  When interviewed in connection with her application for benefits, the interviewer noted that plaintiff "looked tired and was depressed looking."  (Tr. 269).

Plaintiff also has "[c]onstant[]" pain in her right elbow, which pain she rates as a six on a "better day[.]" (Tr. 54-55).  Plaintiff, who is left handed, has to use her left hand to lift her right hand because she cannot raise her right arm, bend it, hold a cup, or open a jar, and coins will slip out of her hand.  (Tr. 55, 250, 251 (impairment affects ability to use one

4

hand), 283).  She reported that it is "[h]ard to button" her clothing, and she is not able to wash well when bathing.  (Tr. 247; see Tr. 275).    Plaintiff gets migraines once a week, for which she needs to relax in a dark room with no noise.  (Tr. 55-56).  She takes Elavil for her migraines.  (Tr. 56).

In addition to taking Elavil/Amitriptyline (Tr. 282, 287-88), Tramadol and Gabapentin, plaintiff takes or has taken Combivir, Viarmune and Atripla for her HIV (Tr. 263, 274, 282, 287-88, 332), Hydrochlorothiazide (Tr. 263, 274), Cymbalta (Tr. 282, 332), Seroquel (Tr. 287-88), Remeron (id.), Loratadine (Tr. 282), Carmol and Oyster Shell (Tr. 287-88), Voltaren Gel (id.), Drisdol (Tr. 332), and Diflucan.   (Id.).

Plaintiff has no record of substantial gainful activity (Tr. 49-50; see also Tr. 64), but she worked in 1995 and 2003 as a packer, and in 1997 as a bagger at a supermarket. (Tr. 261). When presented with a hypothetical of an individual who can work at the sedentary level with occasional climbing of ramps and stairs, but no climbing of ropes, ladders or scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling, with frequent reaching and handling with the right upper extremity, and no work environments that involve hazards, and who is limited to jobs involving simple, routine, repetitive tasks with short, simple instructions, few workplace changes, an attention span to perform simple work tasks for two-hour intervals throughout the eight-hour workday, and who cannot do jobs that require high pace production demands, or a strict adherence to  timed production, Joy, the vocational expert, testified that such an individual could perform the work of a charge account clerk, and order clerk for food and beverage services, or a callout operator. (Tr. 64-66).  Joy also testified that the job of charge account clerk and food and beverage control clerk may be done seated, and since these jobs do not require the use of foot

5

controls, such a person could keep a leg elevated.  (Tr. 69).  However, if such an individual, who had the ability to do frequent reaching, was off-task an additional fifteen percent during the workday, there would be no jobs that such person could perform. (Tr. 68).

Joy also testified that if the individual's capacity for reaching and handling is reduced to occasional, the individual would still be able to perform the work of a callout operator, but could not do the work of a charge account clerk or an order clerk for food and beverage services.  (Tr. 66-67).

B. MEDICAL RECORDS

Plaintiff's relevant[6] medical records begin on October 16, 2009, when plaintiff was

---

[6]As discussed above, at her hearing before the ALJ, plaintiff amended her onset date of disability to December 15, 2009.  (Tr. 47-48).  Prior to her onset date of disability, plaintiff received treatment for many of the same complaints at issue in this case.  On September 1, 1992, plaintiff underwent surgery for a left ankle fracture.  (Tr. 427-28). From May 17-18, 2000, plaintiff was hospitalized at New Britain General for acute gastroenteritis  (Tr. 429-34).  On February 14, 2006, plaintiff was seen at the Chase Clinic of Alliance Medical Group ["Chase Clinic"] for arthralgia of her bilateral hands and wrists; plaintiff reported that she had been diagnosed with arthritis while in prison.  (Tr. 439-41).   She was started on Neurontin.  (Tr. 440).  Plaintiff returned to the Chase Clinic on March 22, 2006 for a follow-up; she was given Naprosyn.  (Tr. 442-44).  On April 5, 2006, plaintiff returned with complaints of hand and foot pain.  (Tr. 445-47).   She was seen at the Waterbury Hospital emergency room on July 27, 2006 for pain in her left lower leg radiating to her foot, for which she was given Toradol IV.  (Tr. 435-38).

Plaintiff returned to the Alliance Medical Group on January 16, 2007 for a follow up for HIV; she was last seen there on June 13, 2006, before she "began drinking alcohol and smoking crack and cocaine[.]" (Tr. 388; see Tr. 387-90).  At that time, she complained of bilateral leg pain and feet pain "for [the] past month."  (Tr. 388).   Plaintiff returned two weeks  later.  (Tr. 392-98).

Plaintiff repeatedly sought care at St. Mary's Hospital emergency room: on January 20, 2007, for a rash on her face  (Tr. 293); on April 20, 2007, for clearance to move to a shelter (Tr. 294); and in May and June  2007, for a boil under her right arm. (Tr. 295-99).

Plaintiff was seen at the Chase Clinic on March 8 and 29, 2007 for sinus congestion and a cough. (Tr. 448-57).  On April 30, 2007, plaintiff returned to the Chase Clinic for complaints of frontal headaches since February 2007,  neck tightness, and a chronic cough.  (Tr. 458-60).   On May 8, 2007, plaintiff was seen at Alliance Medical Group by Linda Sapio-Longo, APRN for a follow-up appointment for her HIV.  (Tr. 399-403).  APRN Sapio-Longo noted that plaintiff was seeing her primary care provider at the Chase Clinic.  (Tr. 399).  On June 4, 2007, plaintiff was seen at the Chase Clinic for a boil under her arm.  (Tr. 461-63).  Plaintiff returned for another follow-up with APRN Sapio-Longo on June 12, 2007 (Tr. 404-10), and on July 12, 2007, plaintiff returned for the

seen for a Mental Health Screening at the Department of Corrections ["DOC"].  (Tr. 300-01).

Plaintiff reported a history of alcohol and cocaine abuse and a history of depression.  (Tr.

301).  On December 28, 2009, plaintiff was seen at the Chase Clinic of Alliance Medical Group

["Chase Clinic"] to re-establish care after her recent incarceration.  (Tr. 347-51).[7]  Among

other issues, plaintiff's history of HIV and neuropathy were noted.  (Tr. 350).  She returned

on January 11, 2010, at which time she was "a little depressed[.]"   (Tr. 343-47).

Additionally, plaintiff was evaluated for her anxillary carbuncles, "most likely MRSA[.]"   (Tr.

346).  Plaintiff was seen again seven days later for her "recurrent a[n]xillary carbuncles[.]"

(Tr. 341-42).

     In early 2010, plaintiff was referred for physical therapy at Access Rehab Centers, but

failed to attend many of the appointments.  (See Tr. 313-24 (attending six out of twelve

appointments)).  On February 1, 2010, plaintiff was seen at the Chase Clinic for joint pain.

(Tr. 337-40).  She had decreased sensation on the left versus the right extremity to "pinprick

and touch to level of mid tibia," and she had 5/5 strength and normal sensation.  (Tr. 339).

On February 16, 2010, plaintiff underwent an X-ray of her left ankle which revealed an old

healed fracture of the distal tibia and fibula, and small degenerative spurs of the talus and

distal tibia.  (Tr. 362).

     On March 8, 2010, plaintiff was seen at the Chase Clinic with complaints of right

elbow pain and left leg pain.  (Tr. 332-36).  She also complained of "feeling down[,]" and

reported that she was "recently started on [D]uloxetine and has been to[le]rating [it] well[,]"

_____

second dose of the Hepatitis B vaccine.  (Tr. 411-13; see also Tr. 464-66 (treatment at Chase
Clinic)).   Plaintiff returned to APRN Sapio-Longo on September 18, 2007 for a follow-up for her
HIV, and for complaints of pain in her foot.  (Tr. 414-18).

     [7]Plaintiff frequently underwent bloodwork.  (See Tr. 352-59, 367, 385-86, 419-22, 477-88).

but, for the two weeks she was taking it, there had not been improvement in her depression symptoms.  (Tr. 332).   She reported a history of suicidal ideation or attempt in 1999, as well as a history of migraines with left finger and left leg numbness.  (Tr. 333).  She was seen two days later by Linda Sapio-Longo, APRN, for a follow up visit for her HIV.  (Tr. 368-74).   APRN Sapio-Longo noted that plaintiff was established with primary care providers at the Chase Clinic and Brass Mall dental.  (Tr. 370).  She reported "achiness" in her left wrist, bilateral legs, and right elbow area for which she was taking Neurontin.  (Id.).   For her depression, she was advised to continue counseling and medication management at the Morris Foundation.  (Tr. 370, 373).  She returned on March 15, 2010 for an injection of her right lateral epicondyle of the elbow.  (Tr. 330; see Tr. 328-31).[8]

An April 1, 2010 bone density test revealed normal bone density.  (Tr. 363; see also Tr. 363-66; see also Tr. 375-76).  Eleven days later, plaintiff returned to APRN Sapio-Longo for an HIV follow-up; she was advised to continue her medications, was advised about risk behavior and was counseled.  (Tr. 377-82).   On August 30, 2010, plaintiff was seen at the Chase Clinic for "persistent" right elbow and left ankle pain; the right elbow pain started in the fall of 2009 while she was incarcerated, and the left ankle pain was secondary to a remote fracture and was accompanied "by a well-documented neuropathy," which was "unchanged."  (Tr. 496-500).  Plaintiff returned to the Chase Clinic on September 22, 2010 with the same complaints.  (Tr. 501-05).  Her pain was causing "some depression."  (Tr. 501).  Dr. Randy Luciano  noted that imaging was negative, and he expressed "doubt [that the source of pain was] orthopedic in nature[.]" (Tr. 504). Dr. Luciano added that it was "unclear if the pain is real."  (Id.).

---

[8]Plaintiff seen on April 7, 2010, at Alliance Medical Group for a urinary tract infection.  (Tr. 325-27).

On April 6, 2011, plaintiff was seen at the Chase Clinic for complaints of more frequent migraine headaches, worsening depression and mood, and persistent pain and feelings of bloating.  (Tr. 506-10).   It was noted that the pain was "likely secondary to remote physical trauma in a person hypersensitive to pain."  (Tr. 509).  One week later, plaintiff returned with complaints of pain in her lower left quadrant.  (Tr. 511-15).[9]  On November 8, 2011, plaintiff was seen at the Chase Clinic for complaints of right elbow pain for the past three weeks, to the point that "she cannot [move her elbow to] eat . . . or [to] comb her hair."  (Tr. 516-20).   The right lateral spicondyle was tender to palpitation, and she had decreased range of motion of the right elbow.  (Tr. 519).  Plaintiff was seen by APRN Sapio-Longo two weeks later for a follow-up visit.  (Tr. 489-95).

On December 8, 2011, plaintiff returned to the Chase Clinic for a cough  (Tr. 521-23), and on December 13, 2011, plaintiff was seen by the psychiatry department at Alliance Medical Group for a follow-up for major depression.  (Tr. 524-25).  She was seen initially on April 19, 2011, but "did not attend [follow-up] appointment due to re-incarceration at Niantic for violation of curfew."  (Tr. 524). Her affect was dysphoric and her cognition was grossly intact; she was started on Remeron.  (Id.).

B. MEDICAL OPINIONS

On January 11, 2010, Dr. Randy Luciano of Alliance Medical Group completed an HIV Questionnaire for plaintiff,  which revealed that she was diagnosed in 1996 and she had "[n]o associated [i]llness[.]" (Tr. 303; see Tr. 302-04).  The same day, Dr. Luciano also completed an evaluation for plaintiff, in which he noted that plaintiff was first and last seen on December 28, 2009 for depression and substance abuse, at which time her cognitive status

---

[9]The notes reference a visit to the St. Mary's Hospital emergency room earlier that week for the same symptoms, for which she had been prescribed Morphine.  (Tr. 511).

was intact, her mood was flat, and her judgment and insight were appropriate.  (Tr. 305-06; see Tr. 305-08).  At that time, plaintiff had a "[s]light [p]roblem" using appropriate coping skills to meet ordinary demands of a work environment, although the assessor noted he only saw plaintiff once before completing this form.  (Tr. 306).  Dr. Luciano was unable to assess plaintiff's ability to engage in social interactions or her task performance.  (Tr. 307).

On February 3, 2010, Dr. Rahim Shamsi completed a psychiatric evaluation of plaintiff for Connecticut Disability Determinaton Services.  (Tr. 309-12).  He noted that plaintiff was polite and cooperative.  (Tr. 309).  Plaintiff reported her history of a broken left ankle, broken left clavicle, damaged tendon in her right elbow, headaches, and pain in her lower back, as well as her history of depression.  (Id.).  Plaintiff reported her history of alcohol and crack cocaine abuse but also reported that she has been clean and sober for three years.  (Tr. 309-10).  She was anxious, depressed, cried often and became angry, was not happy, and her energy and interest in her surroundings was "decreased."  (Tr. 310).  According to plaintiff, "to the extent that her physical condition permits[,]" she occasionally cooked, she grocery shopped with help, and she could "take care of her living quarters[.]"  (Id.).

Dr. Shamsi found plaintiff to have mild anxiety and mild depression, and her "intelligence could be considered possibly as borderline."  (Tr. 310-11).  Additionally, her judgment was "somewhat fair and she had some insight into her problems."  (Tr. 311).  Dr. Shamsi's diagnostic impression was major affective disorder, depressed, recurrent, severe without psychotic features, alcohol dependence and substance abuse, crack cocaine, in remission, and he assigned her a global assessment of functioning ["GAF"] score of 35 at the time of the interview.  (Id.).[10]  He opined that plaintiff was "in need of appropriate psychiatric

---

[10]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30

treatment at this time.  Today[.]" (Id.).

On February 10, 2010, Pamela Fadakar, PsyD, completed a Psychiatric Review Technique of plaintiff, in which she assessed Listings 12.04, Affective Disorders, 12.08, Personality Disorders, and 12.09, Substance Addiction Disorders, and concluded that plaintiff has mild restrictions on her activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace, and has had no episodes of decompensation.  (Tr. 77-78).  In her Mental Residual Functional Capacity ["RFC"] Assessment of plaintiff, Fadakar opined that plaintiff is moderately limited in her ability to understand, remember and carry out detailed instructions, and is moderately limited in her ability to maintain attention and concentration for extended periods and to complete a normal workday and workweek.  (Tr. 79-82).  According to Fadakar, plaintiff can remember, understand, and carry out simple, one-two step instructions of a routine nature and can recall simple, routine work procedures.  (Tr. 81).  Additionally, she can sustain the mental demands needed to carry out simple/routine tasks for two hour periods without supervision, and can adhere to a schedule and make simple work related decisions.  (Tr. 82).  Plaintiff's coping ability and stress tolerance are limited for work requiring strict adherence to time and production quotas, and her mood symptoms may interfere with her ability to sustain focus and may slow her work pace particularly for more complex tasks.  (Id.).

On March 11, 2010, APRN Sapio-Longo completed an HIV Questionnaire for the State of Connecticut Disability Determination Services, in which she noted that plaintiff was

---

(4th ed.).   A GAF score of 31 to 40 indicates "[s]**ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgement, thinking or mood** (e.g., depressed person avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  Id. (emphasis in original).

oriented to time, place and person, she answered questions appropriately, and she was calm and pleasant.  (Tr. 383-84).  Plaintiff reported chronic bilateral leg pain and numbness, and right elbow pain.  (Tr. 384).  APRN Sapio-Longo noted that plaintiff was attending to the Morris Foundation for substance abuse counseling and mental health counseling for depression.  (Id.).  She also noted that plaintiff was seen by her only once, on March 11, 2010, since her September 18, 2007 visit, "as she was incarcerated in [the] interim."  (Id.).

On March 23, 2010, Nalini Masih, MD, completed a RFC Assessment of plaintiff in which she found plaintiff capable of occasionally lifting and/or carrying up to fifty pounds, frequently lifting and/or carrying twenty-five pounds, standing and/or walking about six hours in an eight-hour workday, frequently climbing ramps/stairs, balancing, stooping, kneeling, and crawling, and occasionally climbing ladders/ropes and scaffolds.  (Tr. 79-81).  On May 6, 2010, Anita Bennett, MD, reached the same conclusions in her RFC Assessment of plaintiff.  (Tr. 94-96).

On April 28, 2010, APRN Sapio-Longo completed a Medical Report of plaintiff for SSA, which report was co-signed by Dr. Lydia Barakal.  (Tr. 469-76).  In this report, plaintiff's providers opined that plaintiff's combination of impairments of HIV, anemia, history of substance abuse, arthralgias, vitamin D deficiency, and depression, prevent plaintiff from working for six months or more.  (Tr. 469; see also Tr. 470). Plaintiff's left wrist, bilateral leg, and right elbow pain interfere with her daily activities.  (Tr. 469).  They noted, however, that plaintiff was not seen at their location from September 18, 2007 to March 11, 2010, and thus, "[was] getting reintegrated into care [and] needs follow[-]up." (Id.).  They opined that plaintiff can only sit, stand, or walk for a maximum of one hour during an eight-hour day; can occasionally lift and carry up to ten pounds; cannot use her left foot repetitively for

pushing and pulling leg controls; and can occasionally bend, squat, crawl, reach, and be exposed to environmental irritants, but can never reach or be around unprotected heights. (Tr. 470-74).  Additionally, plaintiff is "[m]oderately [l]imited" in her ability to understand, remember, and carry out detailed instructions, maintain concentration and attention for extended periods, perform activities within a schedule, sustain an ordinary routine, work in coordination with others without being distracted by them, complete a normal workday or workweek, accept instructions appropriately, get along with coworkers without distracting them, maintain socially appropriate behavior, travel in unfamiliar places, or set realistic goals or make plans independently of others.  (Tr. 473-74).  Plaintiff's mental health and substance abuse counseling at the Morris Foundation was noted.  (Tr. 475).  Additionally, side effects from plaintiff's medications were noted, such as dizziness, drowsiness, rash, hallucinations, nausea, heartburn, abdominal pain, and headache.  (Tr. 476).

On May 11, 2010, APRN Sapio-Longo completed an HIV Questionnaire for plaintiff for the State of Connecticut Disability Determination Services, in which she noted plaintiff's diagnoses of HIV, anemia, depression, vitamin D deficiency, and arthralgias.  (Tr. 360-61).  APRN Sapio-Longo noted that plaintiff's medications can cause dizziness, drowsiness, and fatigue and can interfere with remembering details.  (Tr. 361).  Plaintiff also has achiness in her left wrist, bilateral legs, and right elbow, which interferes with standing, walking, lifting and carrying.  (Id.).  APRN Sapio-Longo noted again that plaintiff attends weekly mental health and substance abuse counseling at the Morris Foundation.  (Id.).

Four days later, APRN Sapio-Longo completed a medical report, which was cosigned by Dr. Barakal, in which she noted that she has seen plaintiff from January 11, 2006 to April 12, 2010, but that plaintiff was not seen in her office from September 18, 2007 to March 11,

13

2010.  (Tr. 423; <u>see</u> Tr. 423-26).   She noted that plaintiff has a history of depression with suicidal ideation and attempts in 1999, and that plaintiff was attending the Morris Foundation for mental health and substance abuse counseling since she was released from prison in December 2009.  (Tr. 423).  According to APRN Sapio-Longo, plaintiff was alert and oriented times three, she had a pleasant mood, and her judgment and insight were fair.  (Tr. 423-24). She opined that plaintiff had a "[s]light [p]roblem" using good judgment regarding safety, using appropriate coping skills, interacting with others, asking questions or requesting assistance, respecting or responding appropriately to others, getting along with others, or changing from one simple task to another.  (Tr. 424-25).  Additionally, she had an "[o]bvious [p]roblem" handling frustration appropriately, carrying out multi-step instructions, focusing long enough to finish assigned simple tasks, performing basic work activities, and performing work on a sustained basis.  (<u>Id.</u>).

On June 10, 2010, Kelly Rogers, PhD, completed a Psychiatric Review Technique of plaintiff, in which she reached the same conclusion as Fadakar.  (Tr. 92-93).  Six days later, Dr. Rogers completed a Mental RFC Assessment of plaintiff in which, again, she reached the same conclusions as Fadakar.  (Tr. 96-97).

On December 6, 2011, APRN Sapio-Longo completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on behalf of plaintiff, in which she opined that plaintiff could never lift anything of any weight; she could occasionally carry up to ten pounds in her left arm only; she could sit, stand or walk for a maximum of one hour at any time, and one hour in an eight-hour workday; she could occasionally climb stairs and ramps, stoop, and crouch, but could never climb ladders or scaffolds, balance, kneel or crawl; and she could occasionally move mechanical parts, operate a motor vehicle, be exposed to

14

humidity, wetness, dust, odors, fumes, extreme cold, or vibrations, but could never be around unprotected heights or extreme heat.  (Tr. 527-32).  APRN Sapio-Longo opined that plaintiff could not perform postural activities without "severe pain [in her right] elbow/arm and resultant severe decreased range of motion."  (Tr. 529-30).  According to APRN Sapio-Longo, the results of an MRI of plaintiff's right elbow show a partial tendon tear and lateral epicondylitis; plaintiff reported decreased energy and concentration,had depression, and her medications could cause many side effects, including fatigue, dizziness and decreased concentration.  (Tr. 527, 529-32).  APRN Sapio-Longo opined that plaintiff could shop, travel without a companion for assistance, ambulate, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb steps if a handrail is on the left side, and prepare meals.  (Tr. 532).  She noted, however, that it was difficult for plaintiff to care for her personal hygiene with her current right elbow "partial tear [and] pain[,]" and she could not sort, handle, or use paper/files with this injury.  (Id.).   APRN Sapio-Longo noted that plaintiff does not use a cane to ambulate.  (Tr. 528).  She also commented that plaintiff was not seen at the clinic from July 12, 2010 to November 22, 2011.  (Tr. 532).[11]

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79

---

[11]On December 13, 2011, Dr. Alex Demac of Alliance Medical Group noted that he had been asked to complete a form relating to the evaluation of disability for plaintiff, and he has performed a psychiatric evaluation and follow-up on plaintiff, but if a disability evaluation is required, "this will need to be pursued with a mental health professional who performs disability evaluations."  (Tr. 526).

(2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)(quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. § 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform his former work.  See 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Thomas found that plaintiff has not engaged in substantial gainful activity since December 15, 2009.  (Tr. 31, citing 20 C.F.R. § 416.971 et seq.).  ALJ Thomas then concluded that plaintiff has the following severe impairments: residual effects of an ankle injury; arthritis; right epicondylitis; HIV; and

affective disorder  (Tr. 31-32, <u>citing</u> 20 C.F.R. § 416.920(c)), but that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 32-33, <u>citing</u> 20 C.F.R. §§ 416.920(d), 416.925 and 416.926).   The ALJ concluded that plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) with occasional climbing of stairs and ramps, no ropes, ladders or scaffolds, and occasional balancing, stooping, kneeling crouching, and crawling.  (Tr. 33-37). Additionally, plaintiff is limited to frequent reaching and handling with her right upper extremity with no hazards such as exposure to moving parts or unprotected heights; she is limited to unskilled jobs consisting of simple, routine, repetitive tasks with simple instructions and few workplace changes; she has the attention span to perform simple work tasks for two hour intervals throughout an eight hour workday; and she cannot perform high paced production demands or have strict adherence to timed production.  (<u>Id.</u>).  Accordingly, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, including charge account clerk, order clerk food beverage, and call out operator. (Tr. 37-38, <u>citing</u> 20 C.F.R. §§ 416.969 and 416.969(a)).   Thus, the ALJ found that plaintiff has not been under a disability since December 15, 2009, the date her application was filed. (Tr. 38, <u>citing</u> 20 C.F.R. § 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ committed a number of factual errors, including finding that plaintiff's cognitive functioning is "intact[,]" noting that a treating physician doubted that plaintiff's pain was "real[,]" noting that plaintiff failed to show up at physical therapy sessions, and finding that plaintiff's elbow injury had not been present for the requisite twelve month period  (Dkt.

#16, Brief at 12-13); that the ALJ failed to develop the administrative record (id. at 13-16; see Dkts. ##21-22, at 1-3); that the ALJ failed to properly follow the treating physician rule (Dkt. #16, Brief at 16-20; Dkts. ##21-22, at 4-5); that the ALJ did not properly evaluate the duration, persistence, location and severity of plaintiff's pain (Dkt. #16, Brief at 20-21; Dkts. ##21-22, at 5-6); that the ALJ did not properly determine plaintiff's credibility (Dkt. #16, Brief at 21-24); and that defendant failed to satisfy her burden of proof at Step Five of the sequential analysis.  (Id. at 24-26; Dkts. ##21-22, at 7).

In response, defendant contends that the ALJ had no duty to further develop the record, as the ALJ was in possession of records from all of plaintiff's providers, and plaintiff has failed to show how any failure by the ALJ prejudiced her case (Dkt. #20, Brief at 4-7); the ALJ did not commit errors, or plaintiff has not shown she was prejudiced by the alleged errors (id. at 7-9); substantial evidence supports the ALJ's assessment of plaintiff's RFC, and the ALJ properly weighed the opinion evidence of record (id. at 9-13); substantial evidence supports the ALJ's credibility finding (id. at 13-16); and substantial evidence supports the ALJ's finding at Step Five of the sequential evaluation.  (Id. at 16-17).

### A. ALJ'S DUTY TO DEVELOP THE RECORD

In his decision, the ALJ concluded that plaintiff's depression does not meet Listing 12.04 as plaintiff's mental illness causes only mild limitations.  (Tr. 32-33, 35).  Plaintiff contends, however, that several of the missing medical records pertain to plaintiff's mental health treatment, so that the ALJ's failure to develop the record "significantly prejudiced the case because the missing medical records are critical" to determining the severity of plaintiff's mental illness.  (Dkt. #22, at 1; see Dkt. #16, Brief at 15-16).  Specifically, plaintiff asserts that the critical records are the medical records from the Morris Foundation, where plaintiff receives her mental health treatment, from Dr. Neil Nixdoff, who prescribed Amitryptyline for

19

plaintiff's migraines, from Dr. Alex Demac, who prescribed Seroquel for plaintiff's depression, and from Dr. Henry Crabbe, who prescribed Remeron.  (Dkt. #16, Brief at 15-16).[12] Similarly, plaintiff contends that the ALJ erred in concluding that there is no objective evidence of plaintiff's physical limitations as the ALJ failed to obtain records from Dr. Jane Cooper who has treated plaintiff for arthritis since 2006.  (Dkt. #16, Brief 15; Dkt. #22, at 1-2; see Tr. 369, 393, 407).

Defendant counters that the ALJ had no duty to further develop the record as there are no obvious gaps in the record; plaintiff was represented by counsel and "at no point did either of [p]laintiff's counsel obtain or attempt to obtain the records in question[;]"[13] and, even if the ALJ did not fulfill its duty to develop the record, plaintiff had ample time to provide the missing records to this Court.  (Dkt. #20, Brief at 5)(footnote omitted).

### 1. MENTAL IMPAIRMENT: DEPRESSION

In this case, plaintiff sought benefits in light of her allegedly disabling impairments, which include, but are not limited to, her major depressive disorder.  In his decision, the ALJ concluded that plaintiff has "mild restriction[]" in the area of activities of daily living as the

---

[12]Defendant appropriately notes that there are records from Dr. Nixdorff and from Dr. Demac.  (Dkt. #20, Brief at 5-6; see Tr. 496-500, 506-10, 524-26); see Drake v. Astrue, 443 F. App'x 653, 656 (2d Cir. 2011)(the ALJ did not fail to affirmatively develop the record where the agency requested records from the source in question but the source failed to send complete records.).  However, Dr. Demac's records are clearly incomplete in that he notes that he had "performed a psychiatric evaluation and follow-up on [plaintiff], the records from which are available[,]" but only the records of the follow-up exam are in the transcript.  (See Tr. 524-26). Consistent with the conclusion reached in Section IV.A.1. infra, the ALJ shall request the records from the psychiatric evaluation completed by Dr. Demac.

[13]Plaintiff appropriately notes the ALJ's duty to fully develop the record even when a claimant is represented by counsel (see Dkt. #16, Brief at 13-14); however, in her reply brief, plaintiff inexplicitly asserts that the ALJ has "a 'heightened duty' when the claimant like Ms. Parker is unrepresented." (Dkt. #22, Brief at 2).  As noted above, plaintiff was and continues to be represented by counsel so plaintiff's argument on this point is misplaced. (See Tr. 16, 21, 43, 113-14).

medical record does not contain references to the contrary; plaintiff has "mild difficulties[]" in the area of social functioning as "[t]here are no references to any uncooperative or inappropriate behavior anywhere in the record[;]" plaintiff has "moderate difficulties[]" with regard to concentration, persistence or pace, as there "is no objective indication" that plaintiff's allegations of memory and concentration difficulties, which the ALJ found could "reasonably be expected to result from depression[,]" are "as limiting as alleged[;]" and there is no evidence that plaintiff has experienced episodes of decompensation.  (Tr. 32-33). Accordingly, the ALJ found that plaintiff's depression does not meet the criteria to satisfy Listing 12.04.  (Tr. 33).  As recited above, the ALJ reached this conclusion by relying as much on what plaintiff's medical record did not say, as what it does say.  While the ALJ does not err in relying "not only on what the record says, but also what it does not say[,]" Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)(citations omitted), the question in this case is whether records exist that would in fact alter the decision of the Commissioner.

"Even when a claimant is represented by counsel," as in the case at hand, the ALJ must "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)(multiple citations omitted); see also Morlando v. Astrue, No. 10 CV 1258(MRK), 2011 WL 4396785, at *4 (D. Conn. Sept. 20, 2011)("The Second Circuit has repeatedly emphasized that in the non-adversarial setting of a Social Security hearing, the ALJ has a duty to affirmatively develop the administrative record.") (multiple citations omitted).[14]  Additionally, "the Second Circuit

---

[14]Defendant contends that,

It seems ill advised to allow plaintiffs' counsels to fail in their duty to develop the record and then scour the record for mere mentions of potentially missing records in an effort to obtain remand from this Court.  Rather, this Court should force such counsel to make a compelling showing as to what outstanding evidence actually

has . . . emphasized the extra care necessary 'when adjudicating claims of a litigant whose mental capacity is in question[,]'" as in this case.  Morlando, 2011 WL 4396785, at *4 (multiple citations omitted).  The ALJ's "duty to develop the record is 'especially important' in cases involving mental impairment."  Id. (multiple citations omitted).

As defendant argues, although the ALJ's affirmative duty to develop the record exists, "where there are no obvious gaps in the administrative record, and where the ALJ already possess a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  Lowry v. Astrue, 474 F. App'x 801, 804 (2d Cir. 2012)(citations omitted).   That, however, is not the case here where plaintiff's medical records repeatedly refer to her consistent treatment at the Morris Foundation, yet the ALJ did not consider a single record of such treatment.   There are suggestions in the record that this additional information, if available, would have been helpful to the ALJ's determination.   "When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant[,]" and plaintiff bears the burden of establishing such harmful error.  Santiago v. Astrue, No. 3:10 CV 937(TPS)(CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011), citing Pratts v. Chater, 94 F.3d 34, 37-38 (2d Cir. 1996); see Shinseki v. Sanders, 556 U.S. 396, 409 (2009)("The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.")(multiple citations omitted).   As discussed

---

exists, why [p]laintiff did not obtain it, and why would such evidence have changed the outcome of the case. Moreover, mere speculation should never be enough.

(Dkt. #20, Brief at 5, n.4).  While plaintiff has the burden of producing evidence of her impairments, 20 C.F.R. § 416.912(a)("[The claimant] must furnish medical and other evidence that [the Commissioner] can use to reach conclusions about [the claimant's] medical impairment(s)."), as discussed above, it is the ALJ's burden to affirmatively develop the record.

below, plaintiff has established that the records from the Morris Foundation are significant to establishing her claim of mental impairment. See id.

Plaintiff's treatment records reveal that plaintiff has attended group meetings at the Morris Foundation four days a week, at least since mid-2007 (see Tr. 405), and when plaintiff was seen by APRN Sapio-Longo in March 2010, she noted that plaintiff has attended the Morris Foundation "for mental health and substance abuse counseling since [she was] released from jail in [December 2009]." (Tr. 370). APRN Sapio-Longo advised plaintiff to continue to attend the Morris Foundation for outpatient group meetings. (Tr. 373). In April 2010, it was noted that plaintiff "completed" the program at the Morris Foundation, but continued to attend "weekly" meetings for her "own benefit." (Tr. 379; see also Tr. 381). Similarly, on April 28, 2010, and again on May 14, 2010, Dr. Barakal and APRN Sapio-Longo completed a medical report in which they noted that plaintiff was receiving mental health and substance abuse counseling at the Morris Foundation, which sessions she was attending weekly from her discharge from jail in December 2009. (Tr. 423, 475). However, the majority of the medical records before the ALJ address her physical impairments, and only reference her history of treatment at the Morris Foundation for her diagnosis of major depressive disorder; the underlying treatment records are not in the record before the ALJ. Additionally, while there are sporadic references to mental health treatment in the records from the Alliance Medical Group (see, e.g., Tr. 524), Dr. Demac noted that he had completed a psychiatric evaluation of plaintiff (Tr. 526), yet, such evaluation is not included in the record.[15]

The records from the Morris Foundation are important as they may shed light on

---

[15]See notes 11-12 supra.

plaintiff's depression in a way in which the records before the ALJ cannot.  The ALJ is aware that plaintiff has a history of taking various medications for depression, including Cymbalta (Tr. 272, 282, 332; see Tr. 361), Seroquel (Tr. 287-88), and Remeron (Tr. 287-88, 524).[16] Additionally, plaintiff testified that she experiences depression in that she "lose[s] interest in everything[,]" she has "no energy for nothing[,]" and cries often.  (Tr. 58). The ALJ noted these reports in his decision but then concluded that plaintiff is not credible and such self-reports are not consistent with the record.  (Tr. 34).  Plaintiff also testified that she has suicidal thoughts (Tr. 58), and the medical record includes her history of suicide attempt/suicidal ideation in 1999  (see, e.g., Tr. 333, 338, 344, 348, 370, 378), however, the ALJ did not reference or consider this history.  Additionally, the ALJ "must also consider any observations about the individual records by [SSA] employees during the interviews . . .[,]" see Social Security Ruling 96-7p, 1996 WL 364186, at *5 (S.S.A. July 2, 1996), and in this case, when interviewed in connection with her application for benefits, the interviewer noted that plaintiff "looked tired and was depressed looking." (Tr. 269).  Similarly, Dr. Shamsi, who completed a psychiatric evaluation of plaintiff on behalf of the Agency, noted that plaintiff "is in need of appropriate psychiatric treatment at this time[,]" adding, "Today[.]" (Tr. 311). Yet, the ALJ concluded that Dr. Shamsi's findings, which indicated "substantially reduced mental functioning[,]" were "largely unsupported by objective findings elsewhere in the longitudinal treatment record[,]" and he noted that plaintiff "has received minimal mental health treatment[,]" but the record did not include her reportedly consistent mental health

---

[16]Plaintiff notes the absence of records from Dr. Henry Crabbe "who has prescribed Remeron" for plaintiff's depression (Dkt. #16, Brief at 15); however, the record includes treatment notes from Dr. Demac in which he restarted plaintiff on Remeron on December 13, 2011.  (Tr. 524). Unlike the repeated references to plaintiff's on-going treatment at the Morris Foundation, a singular reference to a doctor's prescription of a medication that has also been prescribed by another treating provider in the record does not reflect a gap in the record.

treatment records from the Morris Foundation.  (Tr. 35).  Despite the foregoing, the ALJ relied on the findings of the non-examining agency consultants, Pamela Fadakar, PsyD, and Kelly Rogers, PhD.  (See Tr. 72-82, 92-97).  The ALJ had a duty to review the records of plaintiff's providers for her mental health impairment, namely, the records from the Morris Foundation, before reaching a conclusion regarding plaintiff's mental limitations, particularly when the ALJ reached his conclusion as to plaintiff's "mild" limitations in light of a lack of treatment records.  Accordingly, in this case,"[w]here the ALJ fails to fulfill the duty to develop the record, the reviewing district court should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence."  Hallett v. Astrue, No. 3:11 CV 1181(TPS)(VLB), 2012 WL 4371241, at *7 (D. Conn. Sept. 24, 2012)(citation omitted).[17]

## 2. PHYSICAL IMPAIRMENT: ARTHRITIS

Similar to the references in the record to plaintiff's treatment at the Morris Foundation, the record is also replete with references to plaintiff's treatment history with Dr. Jane Cooper, the majority of which pre-date plaintiff's amended onset date of disability.  (See Tr. 388 (1/16/07: has not seen Dr. Cooper since June 2006, and now complains of bilateral leg and feet pain "for past month[]"), 390 (1/16/07:  "once insured[,]" plaintiff "will need to follow[-]up with Dr. Cooper[]"), 396 (1/30/07: need to monitor arthralgias and follow-up with

---

[17]Defendant expresses concern that this result can only be reached if this Court does not require a "compelling showing" of what evidence exists.  See note 14 supra, quoting Dkt. #20, Brief at 5, n.4.  However, as discussed above, such a showing has been made, and this Court has incorporated the repeated references to the relevant missing treatment records. Plaintiff need not "scour the record for mere mentions of potentially missing records[,]" as the transcript is replete with references to plaintiff's weekly counseling sessions.  (Dkt. #20, Brief at 5, n.4).  Moreover, this Court concurs with the conclusion reached just six months ago by Senior United States District Judge Warren W. Eginton when addressing a similar argument posed by defendant:  "The problem with this contention is that . . . it presupposes that the record before the ALJ was adequate without knowing the import of the unrevealed medical evidence[.]"  Pniewski v. Astrue, No. 12 CV 1809(WWE), 2014 WL 2815700, at *3 (D. Conn. Jun. 23, 2014).

Dr. Cooper); 402 (5/8/07: same); 405 (6/12/07: "possible early rheumatoid arthritis – sees Dr. Cooper" and sees "Dr. Cooper, Rheumatology"), 407 (6/12/07: note history of arthralgias for which plaintiff "need[s] to monitor and to follow[-]up with Dr. Cooper"); see also Tr. 408 (6/12/17: plaintiff to schedule follow-up with Dr. Cooper), 415 (9/18/07: noting her history of arthralgia and "possible early rheumatoid arthritis – sees Dr. Cooper" but, as of that time, plaintiff had not scheduled a follow-up appointment)).  There are references to Dr. Cooper in the period following plaintiff's amended onset date of December 2009 which reflect plaintiff's treatment history with "rheumatologist, Dr. Cooper[,]" (see, e.g., Tr. 330, 333, 490, 494, 497, 499, 502, 517), but in April 2011, it was noted that plaintiff "no longer sees Dr. Cooper in Rheumatology."  (Tr. 506).  Additionally, while the record reflects plaintiff's complaints of joint pain and decreased sensation on the left versus the right extremity to "pinprick and touch to level of mid tibia[,]" she had 5/5 strength and normal sensation.  (Tr. 339; see also Tr. 349).  Moreover, medical records reveal that her neuropathy is of "unclear etiology[]" (Tr. 350), that despite the "elevated rheumatoid factor[, plaintiff's] history and physical exam are not consistent with rheumatoid arthritis[]"[18] (Tr. 446-47), and that her provider expressed "doubt" that plaintiff, who was described as someone "hypersensitive to pain[,]" was experiencing pain that was orthopedic in nature.  (Tr. 504, 509).  The ALJ appropriately noted the question in the record as to whether plaintiff's "pain was real[,]" and the ALJ did not err in concluding, based on the record, that plaintiff is physically able to "perform sedentary work with the additional restrictions described" in the RFC assessment. (Tr. 36; see Tr. 33, 504 (Dr. Luciano observed: "[i]maging negative, unclear etiology doubt

---

[18]As of 2006, her treating provider noted that to the extent that plaintiff had peripheral neuropathy, as opposed to rheumatoid arthritis, the neuropathy was caused by medication.  (Tr. 446-47).

orthopedic in nature, unclear if pain is real.").  Accordingly, plaintiff has not shown that Dr. Cooper's records would have undermined the ALJ's decision.  <u>See Santiago</u>, 2011 WL 4460206, at *2 (citations omitted).

### B. PLAINTIFF'S REMAINING ARGUMENTS

In light of the conclusion reached in Section IV.A.1. <u>supra</u>, this Court declines to address plaintiff's remaining claims as the ALJ's credibility determination, consideration of the treating providers' opinions, and findings at step five of the sequential evaluation process all may be altered after consideration of the missing mental health records.

### V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #16) is <u>granted in large part such that this matter is remanded consistent with the conclusion reached in Section IV.A.1. supra</u>; defendant's Motion to Affirm (Dkt. #20) is <u>granted in limited part and denied in large part</u>.

The Clerk's Office is instructed that if any party files an appeal in this district court following the administrative decision made upon remand, any subsequent appeal initially is to be assigned to this Magistrate Judge, and then to the District Judge who issued the final Ruling that remanded the case.

The parties are free to seek a district judge's review of this recommended ruling.  <u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file**

**timely objection to Magistrate Judge's recommended ruling may preclude further**

**appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 5th day of December, 2014.

/s/ Joan G. Margolis USMJ
Joan Glazer Margolis
United States Magistrate Judge